IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LAUREN G RULAND, | ) | CASE NO. 1:18CV1191 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Lauren Ruland ("Ruland") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and

Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

## I. Procedural History

On August 17, 2015, Ruland filed an application for DIB, alleging a disability onset date

of May 15, 2006.  Tr. 29, 149.  She alleged disability based on the following: chronic back pain,

depression, and hypertension.  Tr. 153.  After denials by the state agency initially (Tr. 75) and on

reconsideration (Tr. 83), Ruland requested an administrative hearing.  Tr. 95.  A hearing was

held before an Administrative Law Judge ("ALJ") on April 26, 2017, Tr. 24-67, wherein Ruland

amended her alleged onset date to March 31, 2012, her date last insured.  Tr. 30, 148.  In her

August 25, 2017, decision (Tr. 10-19), the ALJ determined that there were jobs that existed in

the national economy that Ruland could have performed during the relevant time period, *i.e.*, on

or before March 21, 2012, in other words, Ruland was not disabled during that period.  Tr. 18.

Ruland requested review of the ALJ's decision by the Appeals Council (Tr. 132) and, on March

23, 2018, the Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Ruland was born in 1961 and was 53 years old on the date she filed her application.  Tr.

136.  She previously worked as a registered nurse.  Tr. 38-43.

### B. Relevant Medical Evidence[1]

Ruland must show that she was disabled on or before March 31, 2012, her date last

insured.  Prior to March 31, 2012, Ruland was living in Idaho and receiving treatment there.  She

moved to Ohio sometime around July 2013, more than one year after her date last insured.  Tr.

198.

#### 1. Evidence dated prior to March 31, 2012

Ruland's back pain began in the late 1990s.  Tr. 339-340.  At that time, her pain was

intermittent, occurred every six months, and lasted two weeks.  Tr. 340.  Eventually the time

between episodes shortened and, in October 2004, Ruland reported almost daily pain.  Tr. 340.

She visited the Spine Institute of Idaho and described her pain as "moderate," i.e., she was

having difficulty dealing with it.  Tr. 340.  She was taking Norco 10 and Soma, a muscle

relaxant, and used a heating pad, all of which provided much relief.  Tr. 343.  An MRI of her

---

[1] Ruland only challenges the ALJ's findings regarding her degenerative disc disease.  Accordingly, only the medical evidence relating to that impairment is summarized and discussed herein.

lumbar spine taken in August 2004 showed an annular tear at L3-4 and a small central disc protrusion at L4-5 which appeared to minimally displace the left L5 nerve root.  Tr. 333.

On November 29, 2004, Ruland went to St. Luke's Meridian Medical Center and Monte H. Moore, M.D., gave her a right L4-5 intralaminar epidural steroid injection.  Tr. 348.

On December 20, 2004, Ruland reported to her primary care doctor Helen Luce, D.O., at Two Rivers Medical Clinic that the injection did not help and she felt like it made things worse. Tr. 355.  She was going to be starting physical therapy.  Tr. 355.  Dr. Luce refilled her pain medication.  Tr. 355.  On January 25, 2005, Ruland returned to Dr. Luce and stated that her physical therapy was working.  Tr. 355.

On October 13, 2005, Ruland followed up with Dr. Luce for her chronic low back pain. Tr. 209.  She reported that her routine pain medication seemed to be working well to control her pain.  Tr. 209.  Dr. Luce refilled her Percocet and Soma prescriptions.  Tr. 209.

On September 22, 2006, Ruland saw Lore Beth Wootton, M.D., at Two Rivers Medical Clinic, "to confess to an episode that happened at work" as a prison nurse.  Tr. 208.  She had been under a lot of stress; her son had a drug problem, her daughter legal problems, and her disabled son was getting more aggressive and had been kicked out of school.  Tr. 208.  "She was dealing with the pain by working extra hours": 60 hours a week at her job as a nurse and she took on another part-time job.  Tr. 208.  Her chronic back pain began to bother her more.  Tr. 208. She took Vicodin tablets from an inmate, got caught, and lost her job at the prison.  Tr. 208.  The Oregon Board of Nursing was contacted and they instructed her to get a counselor, which she stated she had; get an alcohol and drug evaluation; and have her doctor contact the Board to let them know what the doctor thought about her issues.  Tr. 207-208.  Dr. Wootton wrote,

> On reviewing her chart, the patient has had chronic back pain with an MRI in 2004. She had an L4-5 disk protrusion with pressure on the L5 nerve root. In 2004, she underwent

an epidural steroid injection by Dr. Monte Moore, which apparently was not successful in diminishing her pain. She also has seen Dr. Jorgensen at some point through there; although, I do not have records from him. Following that, she was placed by Dr. Luce, here in our clinic, on Percocet q.i.d. and has maintained on that. In fact, in reviewing her records, I do not see any evidence of her requesting her pain medication to be filled early, suggesting that she has been extremely compliant with her meds.

Tr. 207.  Dr. Wootton encouraged Ruland to continue counseling, referred her to pain management to try to diminish her need for narcotics, and stated that hopefully Ruland could resume working as a registered nurse.  Tr. 207.

On October 25, 2006, Ruland saw pain management physician Dr. Moore for a consultation regarding her lower back pain and pain management issues.  Tr. 361.  She reported that she takes up to four Percocet and up to four Soma a day.  Tr. 362.  These medications help with her pain.  Tr. 362.  Her pain interferes with her sleep at times "but does not otherwise limit her activities; that is, she did not restrict her working hours because of pain."  Tr. 362.  Dr. Moore reviewed her MRI results.  Tr. 362.  Upon exam, Ruland's lumbar range of motion was modestly diminished with forward flexion and extension, maneuvers which she found to be painful.  Tr. 362.  Her hip range of motion was normal, she had negative straight leg raise testing, tenderness upon palpation on her lower lumbar spine and the bilateral posterior and lateral gluteal muscles below her iliac crests.  Tr. 362.  Her neurological exam findings showed normal strength in her lower extremities, normal reflexes, a normal gait with heel and toe walking, and she could squat and balance on either lower limb and perform a partial squat.  Tr. 362.  Dr. Moore assessed mild degenerative disc disease and chronic intermittent back pain that had become more frequent.  Tr. 363.  He recommended the following: continued counseling, a home interferential stimulator unit, a return to physical therapy, and a home core stabilization and flexibility program to do regularly.  Tr. 363.  He discussed smoking cessation, referred her to a pain management psychologist for evaluation, and opined that it was "entirely possible" that

4

she could transition from narcotic pain medication to other pain medication strategies and return to functional employment if she was motivated and willing to do it.  Tr. 363.

A year and a half later, on May 2, 2008, Ruland saw Dr. Wootton at Two Rivers Medical Center for an annual wellness exam.  Tr. 205.  She stated that her back continued to be a problem, she took Percocet and Soma about four times a day and this seemed to control it, she occasionally felt pain down her right leg, but "overall she is doing well."  Tr. 205.  Dr. Wootton refilled her Percocet prescription.  Tr. 205.

On June 26, 2009, Ruland returned to Dr. Wootton for an annual wellness exam.  Tr. 204.  Her three main complaints about her health were unrelated to her back problem.  Tr. 204.  Regarding her back pain, she "complains of more pain as her son, who requires large amounts of care, gets older."  Tr. 204.  She wondered about increasing her Percocet and Soma and Dr. Wootton said, "absolutely not."  Tr. 204.  Dr. Wootton explained that, if Ruland is having more pain, "I can send her to a pain specialist and see what her other options are.  She will let me know."  Tr. 203.  Dr. Wootton refilled Ruland's Percocet prescription and switched her antidepressant to Pristiq, which Dr. Wootton stated may help with her perception of pain.  Tr. 203.

On November 29, 2010, Ruland saw Dr. Wootton for her annual wellness exam.  Tr. 201.  She did not report any complaints about her back.  Tr. 201.  She did not report feeling depressed and Dr. Wootton noted that apparently the switch to Pristiq had helped.  Tr. 201.

### 2. Evidence dated after March 31, 2012

On May 30, 2012, Ruland saw Dr. Wootton for an annual wellness exam.  Tr. 200.  She had lost some weight because she had become more active "now that she is helping raise a 2-year old grandson."  Tr. 200.  She had no real concerns or problems.  Tr. 200.  She was still

taking Percocet and Soma up to four times a day "as needed."  Tr. 200.  Dr. Wootton advised that she believed Ruland's biggest health issue was her smoking and recommended cessation and discussed using Chantix, a medication to help stop smoking, and Ruland stated that she would get back to Dr. Wootton about that suggestion.  Tr. 199.

On July 24, 2013, Ruland saw Dr. Wootton for a wellness exam prior to her upcoming move to Ohio.  Tr. 198.  She reported doing well overall and wanted to try tapering off her Pristiq.  Tr. 198.

On September 6, 2013, Ruland was living in Ohio and saw Winston Ho, M.D., to establish care and refill her prescriptions.  Tr. 290.  She provided her records from Idaho which showed that Dr. Wootton last refilled her medications on August 24.  Tr. 290.  Ruland reported being a homemaker taking care of her 24-year old mentally handicapped son.  Tr. 290.  Upon exam, her movements in the office were normal and she had an intact gait.  Tr. 290.  Dr. Ho refilled her prescriptions beginning September 24.  Tr. 291.

On January 20, 2014, Ruland returned to Dr. Ho for a follow-up visit.  Tr. 284.  She told him that her back was getting worse because she has been very busy; she recently adopted her two grandchildren.  Tr. 284.  She wanted to know if she could increase her Percocet dose.  Tr. 284.  Upon exam, she had a normal gait and strength in her extremities.  Tr. 284.  Dr. Ho prescribed Mobic.  Tr. 285.

On March 10, 2014, Dr. Ho refilled her medications.  Tr. 283.  On April 21, she saw Dr. Ho reporting continued back pain.  Tr. 280.  Dr. Ho prescribed Mobic and Flexeril and referred her to Dr. Boylan for pain management.  Tr. 280.

On May 9, 2014, Ruland saw Patrick Boylan, M.D., for pain management.  Tr. 272.  She described her pain as a fairly constant, aching, pressure-type sensation that can be as bad as 8/10

on the pain scale.  Tr. 272.  In general, her pain worsened with increased activity.  Tr. 272.  Her 24-year old autistic son needed almost complete care.  Tr. 272.  Prolonged standing worsened her pain.  Tr. 272.  She denied symptoms in her legs.  Tr 272.  She reported seeing a chiropractor in Idaho.  Tr. 272.  Upon exam, she transitioned from sitting to standing slowly but she had a normal gait.  Tr. 273.  She had some tenderness at her lumbosacral junction and posterior superior iliac spine.  Tr. 273.  She had a very poor range of motion in forward flexion; she "is quite tentative and this increases her lower back pain."  Tr. 273.  She had a somewhat better range of motion with extension and less pain, a pain-free hip range of motion, intact sensation, no muscle atrophy, full leg strength, and symmetric reflexes.  Tr. 273.  Dr. Boylan re-prescribed Percocet and ordered lumbar spine x-rays and an MRI.  Tr. 273.

A lumber spine MRI taken June 28, 2014, showed a focal radial tear at L4-5 with a small disc protrusion causing mild impingement along the midline at L4-5 with no nerve root impingement, and mild stenosis at L5-S1 and L3-4, with no other significant abnormality.  Tr. 223.

On July 3, 2014, Ruland followed up with Dr. Boylan.  Tr. 270.  She stated that the diffuse pain in her back was worse with standing and walking.  Tr. 270.  Dr. Boylan wrote that he had decreased her Percocet dose to three times a day and Ruland reported that she noticed the difference.  Tr. 270.  Upon exam, she had tenderness to palpation in her lower lumbar paraspinal area, pain-free hip rotation, symmetric reflexes, and no leg weakness.  Tr. 270-271.  Dr. Boylan cited her MRI and described her stenosis as mild to moderate at L4-5 and L5-S1.  Tr. 271.  He recommended epidural steroid injections and, thereafter, physical therapy, renewed her Percocet and Mobic, and stated that if her pain did not improve he would consider medial branch blocks.  Tr. 271.

On October 1, 2014, Ruland returned to Dr. Boylan for her back pain.  Tr. 268.  She stated that she could not follow through with an epidural injection because she did not have primary insurance and could not afford it.  Tr. 268.  She believed that she would have insurance at the beginning of the new year.  Tr. 269.  Her back pain was increased with any sort of activity, ranged from 4/10 to 8/10, and she requested an increase in her Percocet.  Tr. 268.  Upon exam, she transitioned from sitting to standing slowly but had a normal gait, a poor lumbar range of motion in flexion and extension secondary to pain, tenderness to palpation in her lower lumbar and upper gluteal areas, pain-free hip rotation, and normal reflexes and leg strength.  Tr. 269. Dr. Boylan increased her Percocet to four times a day.  Tr. 269.

On November 26, 2014, Ruland saw Dr. Boylan for a follow-up visit.  Tr. 266.  She was tolerating a fourth Percocet a day but still reported a lot of pain.  Tr. 266.  Her pain worsened with increased activity.  Tr. 266.  Her exam findings were the same as on her prior visit.  Tr. 267. Dr. Boylan refilled her prescriptions, declined to increase her Percocet, and expressed hope that she would soon have insurance and could get injections.  Tr. 267.

On January 21, 2015, Ruland returned to Dr. Boylan with similar complaints and Dr. Boylan's exam findings were the same.  Tr. 264.  He refilled her medication and again stated that hopefully she will have insurance soon and they can proceed with more aggressive treatment for her back pain.  Tr. 265.

On March 18, 2015, Ruland returned to Dr. Boylan.  Tr. 259.  She reported a bit more pain at night when she rolls over.  Tr. 261.  Her exam findings were similar to her prior visit.  Tr. 262.  She had gotten insurance; Dr. Boylan gave her a physical therapy prescription, refilled her medications, and stated that, if her symptoms did not improve, they would consider injections. Tr. 262.

On May 12, 2015, Ruland returned to Dr. Boylan.  Tr. 255.  She reported that she had not started physical therapy due to a family emergency that required her to watch her two grandchildren as well as take care of her disabled son.  Tr. 257.  Her symptoms were largely unchanged and her pain ranged from 1-2/10 to 7-8/10, depending on her activity.  Tr. 257.  Her exam findings were relatively unchanged, except that her reflexes were slightly depressed.  Tr. 257.  Dr. Boylan refilled her pain medication and wrote that Ruland stated that she should start her physical therapy soon and that he would see her once her therapy had concluded.  Tr. 258.

On July 8, 2015, Ruland followed up with Dr. Boylan.  Tr. 251.  She reported seeing the physical therapist, who did an assessment and gave her exercises to do at home.  Tr. 253.  This increased her lower back and buttock pain such that she was afraid to do the exercises that the therapist recommended.  Tr. 253.  However, the flare-up of her pain had resolved.  Tr. 253.  Upon exam, she transitioned from sitting to standing slowly but had a normal gait, a reduced lumbar range of motion in flexion and extension, tenderness in her lumbar paraspinal and upper gluteal areas, pain-free hip rotation, normal reflexes, and good leg strength.  Tr. 253.  Dr. Boylan reviewed her home exercises and encouraged her to start doing them gradually and increase them as she begins to tolerate it.  Tr. 254.  He refilled her prescriptions and stated that they will consider injections if her symptoms persist.  Tr. 254.

On August 31, 2015, Ruland saw Dr. Boylan for a follow-up.  Tr. 247.  She was trying to do the exercises at home and thought they may have been helping somewhat.  Tr. 249.  She was still taking her pain medication four times a day.  Tr. 249.  She had similar physical exam findings as her last visit.  Tr. 249.  Dr. Boylan suggested a steroid injection at L4-5.  Tr. 250.  Ruland stated that she was not sure her insurance was going to be in force the day following her

visit.  Tr. 250.  Dr. Boylan encouraged her to continue with her home exercise program and refilled her medications.  Tr. 250.

On October 19, 2015, Ruland returned for a follow-up visit.  Tr. 243.  Her pain ranged from 3/10 to 5/10 and she felt better when she was sitting down.  Tr. 245.  She had lost her insurance.  Tr. 245.  She had similar physical exam findings as her last visit.  Tr. 245.  Dr. Boylan continued her medications and advised her to continue to remain as active as she can.  Tr. 246.

On December 11, 2015, Ruland saw Dr. Boylan for her complaints of back pain.  Tr. 241.  Her exam findings were similar to her prior visit except the reflexes in her lower extremities were depressed.  Tr. 241.  Dr. Boylan continued her medications and encouraged her to continue with her home stretching to keep her hamstrings stretched out.  Tr. 242.

On March 4, 2016, Ruland returned to Dr. Boylan.  Tr. 235.  She reported that she had misplaced her last Percocet prescription and her back pain had increased considerably: with her pain medication her pain stayed 3-4/10 but without it her pain was consistently 7-8/10.  Tr. 236-237.  Upon exam, she transitioned from sitting to standing slowly but had a normal gait, very poor lumbar range of motion in flexion and extension and pain, tenderness in her posterior superior iliac spine and upper and lower gluteal areas, pain-free hip rotation, symmetric reflexes, and full leg strength.  Tr. 237.  Dr. Boylan refilled her pain medications and encouraged her to continue with her flexion-based exercise program.  Tr. 237.

On May 26, 2016, Ruland returned to Dr. Boylan for a follow-up visit.  Tr. 306.  She reported that her pain was unchanged.  Tr. 308.  Upon exam, she had a normal gait, a poor lumbar range of motion especially with extension, tenderness in her lumbar paraspinal, upper gluteal area, and posterior superior iliac spine, pain-free hip rotation, symmetric reflexes, and full

leg strength.  Tr.  Tr. 308.  Dr. Boylan encouraged her to remain active and refilled her medications.  Tr. 309.

On August 22, 2016, Ruland returned to Dr. Boylan for a follow-up visit.  Tr. 324-325. She had injured her right ankle the week before and, as a result, had a slightly antalgic gait and more left-sided low back pain.  Tr. 325.  Dr. Boylan refilled her medications and encouraged her to continue to treat her ankle with over-the-counter anti-inflammatories, ice packs, and wrapping it in a bandage.  Tr. 325.

On November 18, 2016, Ruland saw Dr. Boylan.  Tr. 321.  Her back pain was largely unchanged since her last visit, although she reported noticing some pain in her thoracic region over the last couple of weeks.  Tr. 322.  Upon exam, she had a normal gait, increased pain with lumbar extension and less pain with forward flexion, tenderness in her lower lumbar paraspinals and minimal tenderness in her thoracic paraspinals, pain-free hip rotation, depressed reflexes, and full strength in her legs.  Tr. 322.  Dr. Boylan refilled her medication and gave her lumbar rotation exercises to do.  Tr. 323.

On February 15, 2017, Ruland returned to Dr. Boylan for a follow-up visit.  Tr. 329.  Her thoracic pain had resolved and her lumbar pain symptoms were largely unchanged.  Tr. 330.  Her lumbar and lower extremity exam findings were similar to her prior visit.  Tr. 330.  Dr. Boylan refilled her pain medication.  Tr. 330.

**B. Disability Report**

On February 2, 2016, Ruland provided Social Security with her treatment history, writing,

> When I first began seeing a doctor for my back pain, I lived in Idaho. My doctors were Dr. Luce and Dr. Wootton at Two Rivers Medical Clinic in Weiser, Idaho. They should have over 10 yrs of my records there. I believe if you review my records from there you will have a better understanding of my condition.

Tr. 178.

### C. Opinion Evidence

#### 1. Treating source

There are no opinions in the record from doctors who treated Ruland on or before her date last insured, March 31, 2012.

On August 1, 2016, Dr. Boylan completed a "Medical Source Statement Regarding Low Back Pain, Arachnoiditis, or Spinal Stenosis" on behalf of Ruland.  Tr. 311-312.  The form asked Dr. Boylan to provide his answers based on his knowledge, personal observation, and review of the past medical history of Ruland for the time period prior to March 31, 2012, and continuing to the present.  Tr. 311.  Dr. Boylan checked boxes indicating that Ruland had lumbar spinal stenosis, she needed to change positions every two hours, she had limited range of motion in her spine, and she had an inability to ambulate effectively.  Tr. 311.  Her pain level was "marked" and she could work between one and two hours a day, stand for one hour, sit for 2 hours, walk for 30 minutes, occasionally lift five pounds and frequently less than that, and could occasionally bend and stoop.  Tr. 311-312.

Dr. Boylan also filled out an "Off-Task/Absenteeism Questionnaire" on Ruland's behalf. He opined that Ruland would be off task 20 percent of an 8-hour workday due to lower back pain and drowsiness and a decreased ability to concentrate due to pain medication, and that she would be absent more than four times a month.  Tr. 313.

#### 2. State Agency Reviewers

On November 10, 2015, state agency reviewing physician Lynne Torello, M.D., reviewed Ruland's record and opined that there was insufficient evidence to evaluate her claim that she

was disabled prior to March 31, 2012. Tr. 70-71. On December 21, 2015, Gerald Klyop, M.D., reviewed Ruland's record and agreed. Tr. 78-79.

### D. Testimonial Evidence

#### 1. Ruland's Testimony

Ruland was represented by counsel and testified at the administrative hearing. Tr. 26. She lives with her husband, her 27-year old son, who is disabled, and grandson (the son of another of Ruland's children). Tr. 35-36, 53. Her adult son is autistic and needs help dressing and toileting. Tr. 36. Ruland has to assist him, watch and guide him, and prepare his food. Tr. 52. Her grandson is seven years old and Ruland raised him. Tr. 36-37.

Ruland discussed her duties as a nurse in the prison system, where she worked for seven years, and as a hospital nurse, where she worked for 13 years. Tr. 38-43. At the time she lost her job at the prison, in 2006, her pain had gotten to the point where she would have to get up earlier in the morning just to move around and be mobile. Tr. 43, 49. She had to do a lot of walking and lifting at work; there were 3,000 inmates and it was like a little town. Tr. 43.

Ruland stated that when she first started experiencing daily back pain in the early 2000s, she went to chiropractors for a while but they did not help and seemed to make things worse. Tr. 44, 48. Then she started to see her primary care doctor and tried physical therapy, which provided some help. Tr. 49. She started taking Percocet in the early 2000s. Tr. 44. She started taking a low dosage and then, when it didn't work anymore, they raised the dosage. Tr. 45. She currently took Soma, a muscle relaxer, and Percocet four times a day; in the past she may have taken less, depending on the day. Tr. 45. She was using Percocet and Soma four times a day in 2004 and in 2008. Tr. 45, 49. The Soma made her sleepy. Tr. 56. Sometimes, when she had been working, she would fall asleep at work. Tr. 57-58. She always got her medications from

her primary care physicians at Two Rivers Medical Center.  Tr. 49.  She would call to get her prescriptions every month; she would not have to go in.  Tr. 59.  In 2004, when she was taking her medications four times a day, she was working as a nurse full time and overtime.  Tr. 49.  But in 2006, four pills a day was not enough some days to cope with her pain and that is when she got in trouble for taking pills at the prison.  Tr. 50.  She was desperate.  Tr. 50.  After she lost her job at the prison she tried to work at a hotel in 2007 and 2008, sitting at a desk, but she was unable to sit for that long; she had to keep moving.  Tr. 51.  She did not try to get her nurse license back because she was in so much pain she did not think it would work.  Tr. 43.

Her back pain does not radiate.  Tr. 45-46.  She stated that the epidural steroid injection she got in 2004 did not help at all; therefore, she decided not to have any more.  Tr. 47.  Also, when she had this procedure she stopped breathing and they had to shake her to get her breathing again; this is another reason she did not want another injection.  Tr. 47.

Ruland described a typical day that she would have in March 2012.  Tr. 53.  She would get up an hour or two early, before anyone else, "so I could get the kinks out and so I could even walk around."  Tr. 53.  She got the three kids off to school.  Tr. 53.  Then she would do what she could with the cleaning and the grocery shopping, although there were times she couldn't do anything.  Tr. 53.  She would have to move around between sitting, standing and walking.  Tr. 54.  She would take a nap for about an hour or an hour and a half.  Tr. 57.  She could stand for maybe 45 minutes to an hour and sit for the same amount of time; "kind of back and forth."  Tr. 54.

Ruland has good days and bad days; on a bad day she would cry.  Tr. 54.  Even going to the bathroom is hard; twisting, bending, walking.  Tr. 54.  In March 2012, she estimated that she had about 10 bad days a month.  Tr. 55.  When the pain was that bad, she uses and used

Absorbine, Jr., her heating pad, pain pills, and a hot shower or bath.  Tr. 55.  She estimated she could lift and carry about five pounds, back in March 2012.  Tr. 55-56.  If she lifted more weight than that she would feel it in her lower back.  Tr. 56.  It is uncomfortable to bend to tie her shoes but she can do it.  Tr. 56.  On a bad day she would not leave the house.  Tr. 56.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  Tr. 60-67.  The ALJ discussed with the VE Ruland's past work as a registered nurse.  Tr. 61-62.  The ALJ asked the VE to determine whether a hypothetical individual of Ruland's age, education and work experience could perform her past work or any other work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could not perform her past work but could perform other jobs in the national economy such as cashier, mail clerk, and clerical assistant.  Tr. 63-64.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

15

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her August 25, 2017, decision, the ALJ made the following findings:

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1.      The claimant last met the insured status requirements of the Social
        Security Act on March 31, 2012.  Tr. 12.

2.      The claimant did not engage in substantial gainful activity during the
        period from her alleged onset date of May 15, 2006 through her date last
        insured of March 31, 2012.  Tr. 12.

3.      Through the date last insured, the claimant had the following severe
        impairments: mild degenerative disc disease.  Tr. 12.

4.      Through the date last insured, the claimant did not have an impairment or
        combination of impairments that met or medically equaled the severity of
        one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
        Tr. 13.

5.      Through the date last insured, the claimant had the residual functional
        capacity to perform light work as defined in 20 CFR 404.1567(b) except:
        can occasionally lift and carry 20 pounds; can frequently lift and carry 10
        pounds; can stand and walk 6 hours in an 8-hour workday; unlimited
        push and pull other than shown for lift and/or carry; occasionally climb
        ramps and stairs; never climb ladders, ropes and scaffolds; occasionally
        stoop, kneel, crouch and crawl.  Tr. 13.

6.      Through the date last insured, the claimant was unable to perform any
        past relevant work.  Tr. 17.

7.      The claimant was born in 1961 and was 50 years old, which is defined as
        an individual closely approaching advanced age, on the date last insured.
        Tr. 17.

8.      The claimant has at least a high school education and is able to
        communicate in English.  Tr. 18.

9.      Transferability of job skills is not material to the determination of
        disability because using the Medical-Vocational Rules as a framework
        supports a finding that the claimant is "not disabled," whether or not the
        claimant has transferable job skills.  Tr. 18.

10.     Through the date last insured, considering the claimant's age, education,
        work experience, and residual functional capacity, there were jobs that
        existed in significant numbers in the national economy that the claimant
        could have performed.  Tr. 18.

11.     The claimant was not under a disability, as defined in the Social Security
        Act, at any time from May 15, 2006, the alleged onset date, through
        March 31, 2012, the date last insured.  Tr. 19.

## V. Plaintiff's Arguments

Ruland argues that the ALJ failed to properly analyze the opinion of her treating physician, Dr. Boylan.  Doc. 9, p. 1.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Because Ruland's date last insured for purposes of receiving DIB benefits is March 31, 2012, she cannot be found disabled unless she can establish that she was disabled on or before that date.  *Garner*, 745 F.2d at 390.  Thus, "[e]vidence of disability obtained after the expiration of insured status is generally of little probative value."  *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004) (citing *Cornette v. Sec'y of Health & Human Servs.*, 869 F.2d 260, 264 n. 6 (6th Cir. 1988)).  This applies to instances when a treating physician's opinion is tendered after the relevant period but purports to cover the prior, relevant period.  *Id*. at 845 (treating physician's retrospective opinion rendered long after the relevant period indicating that the claimant was disabled during the relevant period is not entitled to significant weight because it

was not supported by relevant and objective evidence).  A treating physician's opinion rendered

after the relevant time period may be considered to the extent it illuminates the claimant's health

as it was prior to the date last insured.  *Stark v. Comm'r of Soc. Sec.*, 2016 WL 1077100, at *8

(N.D.Ohio March 18, 2016) (quoting *Nagle v. Comm'r of Soc. Sec.*, 191 F.3d 452 (6th Cir.

1999)).  However, if there is substantial evidence from the relevant time period to support the

ALJ's finding that the claimant could perform substantial gainful activity and the claimant does

not present any contemporaneous medical evidence of disability from the relevant time period,

the claimant has not carried her burden of proving disability.  *See Strong*, 88 Fed. App'x at 845-

846.

Ruland agrees that Dr. Boylan's opinion must be supported by relevant, objective

evidence during the relevant period, i.e., evidence dated prior to March 31, 2012.  Doc. 13, p. 1.

She argues that the ALJ failed to consider whether Dr. Boylan's retrospective opinions were

supported by relevant, objective evidence during the relevant time period and complains that the

ALJ instead "focused on the fact that Ms. Ruland was living and treating in rural Idaho during

much of the relevant time period."  Doc. 13, p. 1.

Ruland's argument fails.  The ALJ focused on Ruland's treatment in Idaho because

Ruland lived in Idaho during the entire relevant period.  The ALJ stated the facts: Ruland lived in

Idaho prior to March 31, 2012; she lived in Idaho for over a year *after* March 2012; she moved to

Ohio sometime in the summer of 2013; she began seeing Dr. Boylan in 2014; and Dr. Boylan

rendered his opinion in August 2016. Tr. 15, 16.  The ALJ gave "little" weight to Dr. Boylan's

opinion, observing that Ruland was not treating with Dr. Boylan during the relevant period and

that Dr. Boylan rendered his opinion "more than 4 years past the date last insured, and was

commenting on a time period several years before his treating relationship with the claimant

began." Tr. 16.  This is accurate and proper because it sets forth the retroactive nature of Dr. Boylan's opinion.  *See Strong*, 88 F. App'x at 845-846 (a retroactive opinion must be supported by evidence in the record from the relevant time period); *Clendening v. Astrue*, 2011 WL 1130448, at *5 (N.D.Ohio March 28, 2011) ("The ALJ was justified in rejecting [retrospective treating source] opinions since neither doctor had firsthand knowledge of Clendening's condition prior to the date last insured.").

Elsewhere in her decision, the ALJ detailed Ruland's treatment history for her back pain in Idaho: her daily pain beginning in 2004 and an MRI that showed an annular teat at L3-4 and a small central disc protrusion at L4-5 which minimally displaced the left L5 nerve root.  Ruland went to the Spine Institute of Idaho and reported that she experienced relief with narcotic medication, muscle relaxers and a heating pad.  She had an epidural injection, which she later told her primary care physician did not help, and her physician recommended she try physical therapy, which did help.  Throughout 2005, Ruland continued her medication regime (Percocet, Soma) which worked well to control her pain.  Tr. 14-15.

The ALJ explained that, in September 2006, Ruland was referred to Idaho Physical Medicine and Rehabilitation for an evaluation for pain management strategies.  Her physical exam findings showed a normal gait, tenderness to palpation, and a modestly diminished lumbar range of motion upon flexion and extension.  The pain management doctor assessed her with mild degenerative disc disease.  He referred her to a pain management psychologist and recommended physical therapy.  The ALJ remarked that, after this pain management evaluation, the only medical records concerning treatment of Ruland's back pain consisted of her annual wellness visits to her primary care physician at Two Rivers Medical Center.  The ALJ detailed these annual wellness visits: in 2008, 2009, 2010.  Tr. 15.  The ALJ remarked that Ruland did

not appear to seek any treatment between her annual wellness visit in 2010 until her date last

insured, March 2012.  She last saw her physician at Two Rivers Medical Center in July 2013 for

an annual wellness exam prior to her move to Ohio.  Throughout this time period she had

continued taking pain medication and she reported that the medication worked well to control her

pain.  Although Ruland reported increased pain at her 2009 annual well visit and requested an

increase in her pain medication, this request was denied and she was referred to a pain

management clinic.  No pain management visits are in the record.  Instead, Ruland returned to

her primary care physician for her next annual wellness visit.  The ALJ commented that it was

unclear from the record whether Ruland sought any other treatment for her mild degenerative

disc disease prior to her date last insured, March 31, 2012.  Tr. 15-16.  In short, during the

relevant period, Ruland primarily treated her back pain with medication and annual visits to her

primary care physicians.  *See Kepke v. Comm'r of Soc. Sec.*, 636 Fed. App'x 625, 631 (6th Cir.

2016) (the claimant's conservative treatment is a "good reason" to discount a treating physician

opinion) (citing *Lester v. Soc. Sec. Admin.*, 596 Fed. App'x 387, 389 (6th Cir.2015); *McKenzie v.

Comm'r of Soc. Sec.*, 215 F.3d 1327, at *4 (6th Cir. May 19, 2000) (unpublished opinion); 20

C.F.R. § 404.1527(c)(2) ("We will look at the treatment the source has provided....")).

When discussing Dr. Boylan's retroactive opinion, the ALJ remarked that not only was

Ruland being treated at Two Rivers Medical Center until March 31, 2012, she continued to be

treated there until more than one year later, in July 2013.  Tr. 16.  The ALJ commented that, at

this last visit, an annual exam, Ruland stated that "she [was] doing well overall."  Tr. 16.  As the

ALJ explained elsewhere in her decision, beyond a few early attempts at different types of

treatment, up until March 2012 (and for over a year later) the only treatment Ruland pursued for

her mild degenerative disc disease was the regular medication regime she obtained from her

primary care physician, whom she saw annually during wellness visits. She was given further treatment recommendations but no evidence in the record shows she followed up with these recommendations. Tr. 15. All this is contemporaneous evidence that supports the ALJ's findings that Dr. Boylan's opinion is entitled to little weight and that Ruland could perform substantial gainful activity. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (an ALJ must give the opinion of a treating source controlling weight if she finds the opinion not inconsistent with the other substantial evidence in the case record); 20 C.F.R. 404.1527(c) (ALJ must give good reasons for the weight given to treating source opinions and considers factors such as the treatment relationship, supportability and consistency of the opinion); *Strong*, 88 Fed. App'x at 845-846.

Ruland does not present contemporaneous medical evidence of disability from the relevant time period and, therefore, has not carried her burden of proving disability. *See id*. She identifies her 2004 MRI, her lumbar steroid injection in 2004, and the fact that she treated for back pain with her primary care doctor since at least October 2004. Doc. 9, pp. 15-16; Doc. 13, p. 1. The ALJ considered this evidence (Tr. 15) as described above; this evidence does not show that Ruland was disabled. The other evidence Ruland details (Doc. 9, pp. 16-17) begins in May 2014 and it is not evidence from the relevant time period.

Ruland argues that the ALJ's reliance upon a treatment note from her annual wellness visit is insufficient because a "wellness check" is not a visit for chronic back pain because the doctors are "preoccupied with your height, weight and blood pressure during such visits." Doc. 9, p. 18. But Ruland ignores the fact that these annual wellness visits were the only record evidence of her treatment for back pain for three years prior to March 2012. Moreover, Ruland discussed her chronic back pain during these visits. She got her pain medication from her

primary care physicians.  She admits that these were the doctors who treated her back pain.  Tr.
178.  The fact that she saw her primary care physicians annually for wellness exams and
discussed her back pain, received pain medication from them, and reported at her last visit (one
year after the date last insured) that she was doing well on the same pain medication regimen that
she had been taking for years does not establish disability during the relevant time period.

Ruland asserts that the ALJ incorrectly identified Dr. Boylan as Ruland's primary care
physician, when in fact he is a board-certified pain management specialist.  Doc. 9, p. 12.  Be
that as it may, the specialization of Dr. Boylan does not change the operative fact that Dr. Boylan
started treating Ruland two years after her date last insured and does not cure the insufficiency of
the evidence of disability during the relevant period.  Ruland complains, "the ALJ failed to note
that Dr. Boylan had access to all of Dr. Luce and Dr. Wootton's records [from Two Rivers
Medical Center] to assist with his treatment of Ms. Ruland."  Doc. 9, p. 13.  That Dr. Boylan
"had access" to Ruland's prior records while treating her likewise does not cure the infirmity in
his opinion.  Moreover, Ruland's treatment with Dr. Wootton remained the same from 2008 until
2013: medication refills and annual well visits.  Ruland does not identify any evidence during the
relevant period that Dr. Boylan purportedly relied upon to show that she was as limited as he
assessed her to be during the relevant period.

Finally, Ruland complains that Dr. Boylan's opinion should be given complete deference
because it is the only opinion in the record.  Doc. 9, pp. 14-15 (citing *Cohen v. Sec'y of Health &
Human Servs*., 964 F.2d 524, 528 (6th Cir. 1992)).  In *Cohen*, the Sixth Circuit wrote,

> In determining whether a claimant is entitled to disability insurance payments, medical
> opinions and diagnoses of treating physicians are entitled to great weight, and, if
> uncontradicted, are entitled to complete deference.  *King* [*v. Heckler*], 742 F.2d [968,]
> 973 [(6th Cir. 1984)].  The ALJ, however, is not bound by conclusory statements of
> doctors, particularly where they are unsupported by detailed objective criteria and
> documentation.  *Id*.; *Duncan* [*v. Sec'y of Health & Human Servs*., 801 F.2d [847,] 851

[(6th Cir. 1986)].

964 F.2d at 528.  Ruland interprets "uncontradicted" to mean that there are no other opinions in the record but cites no legal authority for this interpretation.  Legal authority suggests otherwise. *See, e,g., King v. Heckler*, 742 F.2d 968, 972-973 (6th Cir. 1984) (considering whether objective evidence supported the treating physician's opinion); *Martin v. Comm'r of Soc. Sec*., 2003 WL 1870731, at *7 (6th Cir. 2003) ("[T]he ALJ is not bound by the opinion of a treating physician if the opinion is contradicted by objective medical evidence" citing *Cohen*); *Jenkins v. Berryhill*, 2017 WL 2579087, at *14 (N.D.Ohio May 31, 2017) (rejecting the claimant's argument that, per *Cohen*, a treating physician opinion that is the sole opinion on an issue is entitled to complete deference, when the ALJ provided good reasons for discounting the opinion, *report and recommendation adopted*, 2017 WL 2573282).

In short, the ALJ did not err when assessing Dr. Boylan's opinion and her decision is supported by substantial evidence.  The ALJ's decision, therefore, must be affirmed.  *See Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: March 8, 2019

/s/ Kathleen B. Burke
_____
Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).